THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| Bo WANG, Individually and on behalf of X.C.W. as the "Next Friend" of X.C.W., a minor, | Case No. 8:17CV375 |
| Plaintiff, | COMPLAINT, JURY DEMAND, |
| v. | |
| THE STATE OF NEBRASKA, NEBRASKA DEPARTMENT OF HEALTH AND HUMAN SERVICES, COURTNEY PHILLIPS, DOUGLAS WEINBERG, JENNIFER WHITE, CARLA HEATHERSHAW-RISKO, ELIZABETH CRNKOVICH, AMY SCHUCHMAN, MICHAEL CIMINO, KERSTEN BORER BRENDA WHEELER, MARK GENTILE, CHAD MILLER, NEBRASKA FAMILIES COLLABORATIVE, DEANNA SHELLER, SARA SMITH,EVAN WINANS,MILLARD PUBLIC SCHOOLS, SUSAN HANCOCK, GREGORY TIEMANN, MATTHEW HEYS CHRISTIAN HERITAGE, SONIA DERR, RELIABLE ROCK COUNSELING AND CONSULTING, P.C. AMANDA GUROCK JUDY MCAULIFFE TREINEN, MARTIN HARRINGTON, M.D., CHILDREN'S HOSPITAL AND MEDICAL CENTER, KARA BEALS, COUNTY OF DOUGLAS, DAVID NEWELL, MELISSA K. NANCE and JOHN DOES 1-30 | |
| Defendants. | |

COMES NOW Plaintiff Bo Wang, individually and on behalf of X.C.W., as the "Next Friend" of X.C.W., and for his causes of action against Defendants, alleges as follows:

**PARTIES**



RECEIVED

OCT 1 0 2017

CLERK
U.S. DISTRICT COURT

1

1.  Plaintiff, Bo Wang ("Wang") is a resident of Bell County, Texas, and has been a resident of Bell County, Texas at all times relevant to this Complaint.

2.  Plaintiff Wang is the natural and biological father, psychological father and the "Next Friend" of X.C.W. Plaintiff and his wife Catherine Yang Wang Anderson ("Wang Anderson") raised X.C.W. for the first fifteen (15) years of her life. During that time, X.C.W. was loved, protected, guided, kept in excellent health, and thrived academically and in all other respects.

3.  On March 13, 2017, X.C.W. was a minor child, aged eighteen, domiciled in Douglas County, Nebraska without any legal guardian or legal parent and has been Un-Constitutionally, and without jurisdiction, made a Ward of the State of Nebraska. On information and belief, X.C.W. was against her will and in violation of her liberty interests under the Constitution for the United States of America, in the wrongful custody of the Nebraska Department of Health and Human Services ("NDHHS").

4.  The actions of the Defendants are in violation of X.C.W.'s Constitutional Rights and were harming her by placing her in a dangerous foster home, harming her ability to function physically, mentally, emotionally, and socially, harming her ability to function academically or obtain employment, and preventing her from residing under the guardianship of, and continuing her bond and freedom of association with, the Plaintiff.

5.  The Defendant NDHHS, and specifically its Division of Children and Family Services, is Nebraska's child protection and child welfare agency, and is responsible for providing and supervising all public child welfare services in the State of Nebraska. At all relevant times, the mission of the Division of Children and Family Services has been to provide the least disruptive services when needed, for only as long as needed to: give children the

2

opportunity to succeed as adults; and, help families care for themselves; resulting in healthier families and safer, more prosperous communities.

6.  The Defendant Nebraska Families Collaborative ("NFC") is a Nebraska Non Profit Corporation with its principal place of business in Omaha, Douglas County, Nebraska.  At all relevant times, NFC had a contract with NDHHS to provide case management and an individualized system of care for families and their children and youth who are wards of NDHHS involved in the Child Welfare or Juvenile Court System.  On information and belief, at all relevant times, NFC was the only entity authorized and responsible for providing these services in Omaha, Douglas County, and immediately surrounding areas.  At all relevant times, NFC had a duty to abide by all policy requirements of the Nebraska Administrative Code; applicable state and federal statutes and regulations; and any other applicable codes; applicable written policy directives and interpretations from or as directed by NDHHS.  At all relevant times, NFC was responsible for providing case management and an individualized system of care for X.C.W., Wang Anderson, and Bo Wang, M.D.  NFC has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.  NFC has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below.  This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

3

7.  The Defendant Christian Heritage ("Christian Heritage") is a Nebraska Non Profit Corporation which provides medical and behavioral health care, social services and education in the State of Nebraska.  On information and belief, at all relevant times, Christian Heritage had a contract with NDHHS or NFC to provide foster care services for X.C.W.  Christian Heritage has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.  Christian Heritage has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below. This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

8.  The Defendant Courtney N. Phillips ("Phillips") is the current chief executive officer of the NDHHS and is liable for her actions in her official capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

9.  The Defendant Douglas J. Weinberg ("Weinberg") is the director of the Division of Children and Family Services of NDHHS and is liable for his actions in his official capacity done under color of state law.  This Defendant is entrusted to protect the Constitutional rights of

4

those he encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

10. The Defendant Brenda Wheeler ("Wheeler") was a deputy of the Sheriff of Douglas County, Nebraska, and is liable for her actions in her individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

11. The Defendant Mark Gentile ("Gentile") was a deputy of the Sheriff of Douglas County, Nebraska, and is liable for his actions in his individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

12. The Defendant Chad Miller ("Miller") was a deputy of the Sheriff of Douglas County, Nebraska, and is liable for his actions in his individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

13. The State of Nebraska is responsible for the actions of its agencies, gents, and employees, and subject ot suit under section504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), 42 U.S.C. § 200d, and the Nebraska State Tort Claims Act.

14. The Defendant County of Douglas "Douglas County") is a political subdivision situated within the State of Nebraska.

15. The Defendant David Newell ("Newell") is the current chief executive officer of NFC and is liable for his actions in his official capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

16. The Defendant Matthew D. Heys (hereinafter "Heys") is a resident of the State of Nebraska, and, at all relevant times has been employed by Millard Public Schools as a teacher at Millard West. Heys was one of Y.C.W.'s teachers. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

17. The Defendant Gregory Tiemann (hereinafter "Tiemann") is a resident of the State of Nebraska, and, at all relevant times has been employed by Millard Public Schools as a principal at Millard West. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

18. The Defendant Susan Hancock (hereinafter "Hancock") is a resident of the State of Nebraska, and, at all relevant times has been employed by Millard Public Schools as a social counselor at Millard West. This Defendant is entrusted to protect the Constitutional rights of

6

those she encounters and at all relevant times was acting under the color or title of state law, or

acted in concert with one or more of the other Defendants in the performance or conduct of their

actions.

19. The Defendant Millard Public Schools ("MPS") was the public school district for the

City of Omaha. On information and belief, MPS has caused, created, authorized, condoned,

ratified, approved or knowingly acquiesced in illegal, unconstitutional, and inhumane conditions,

actions, policies, customs and practices that prevail throughout the services it provides. MPS has

directly and proximately caused, and will continue to cause in the future, the damages, injuries

and violations of rights set forth below. This Defendant is entrusted to protect the Constitutional

rights of those it encounters and at all times relevant hereto was acting within the scope of its

duties and authority, under color or title of state law, supervised or controlled one or more of the

other individual Defendants herein, or acted in concert with one or more of the other individual

Defendants in the performance or conduct of their actions.

20. The Defendant Deanna Sheller ("Sheller") is a resident of the State of Nebraska, and

at all relevant times was employed by NDHHS, as a Family Engagement Specialist. This

Defendant is entrusted to protect the Constitutional rights of those she encounters and at all

relevant times was acting under the color or title of state law, or acted in concert with one or

more of the other Defendants in the performance or conduct of their actions.

21. The Defendant Sara Smith ("Smith") is a resident of the State of Nebraska, and at all

relevant times has been employed by NFC as a family permanency specialist or family

permanency specialist supervisor. At all relevant times, Smith has been the family permanency

specialist for X.C.W. and her family. This Defendant is entrusted to protect the Constitutional

rights of those she encounters and at all relevant times was acting under the color or title of state

7

law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

22. The Defendant Evan Winans ("Winans") is a resident of the State of Nebraska, and at all relevant times has been employed by NFC as a family permanency specialist supervisor. At all relevant times, Winans has been the family permanency specialist supervisor for X.C.W. and her family. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

23. The Defendant Melissa K. Nance ("Nance") is the Family Permanency Director of NFC and is liable for her actions in his official capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

24. The Defendant Elizabeth Crnkovich ("Judge Crnkovich") who, upon information and belief, at all relevant times has been, and currently is a Judge of the Separate Juvenile Court for Douglas County, Nebraska, and during relevant times to this Complaint acted as a witness to events set forth in this Complaint, is liable for her acts and omissions in her individual and official capacities done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

8

This Judge, by her actions or omissions, has acted in violation of the Plaintiff and X.C.W.'s Constitutional Rights without jurisdiction, has facilitated and enabled NDHHS and NFC to continually and invidiously violate the rights of Plaintiff and X.C.W., and others similarly situated as parents in the State of Nebraska, without consequence or enforcement of the Constitution of the United States of America.

25. The Defendant Judy McAuliffe Treinen ("Treinen") is a resident of Douglas County, Nebraska. At all relevant times, Treinen was a licensed mental health practitioner, social worker, and professional counselor in the State of Nebraska. On information and belief, Treinen provided health services, including therapy, to Y.C.W. from October of 2013 through May of 2014. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

26. The Defendant Amanda Gurock ("Gurock") is a resident of Albany County, New York. At all relevant times, Gurock was a licensed mental health practitioner, social worker, and professional counselor in the State of Nebraska. On information and belief, Gurock provided therapy and other service to Y.C.W. from October of 2013 through April of 2015, in the State of Nebraska. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

27. The Defendant Reliable Rock Counseling & Consulting, P.C. ("Reliable Rock") is a Nebraska Professional Corporation with its principal place of business in Douglas County, Nebraska, which provided therapeutic and other services. On information and belief, Reliable Rock has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in

9

illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides. Reliable Rock has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below. This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

28. The Defendant Sonia Derr (hereinafter "Derr") is a resident of Douglas County, Nebraska. At all relevant times, Derr was a licensed foster parent. From about October 9, 2013 through January, 2014, X.C.W. was placed Derr's care. On information and belief, Derr provided foster care services to X.C.W. and her sister, Y.C.W. pursuant to a contract or agreement with the State of Nebraska, NDHHS, NFC, or KVC. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

29. The Defendant Martin Harrington, M.D. (hereinafter "Dr. Harrington") is a resident of the State of Nebraska, and is a licensed physician who practices psychiatry in Omaha, Nebraska. At all relevant times, Dr. Harrington has been the medical director of the Children's Hospital and Medical Center Eating Disorders Program, and has provided health care services to X.C.W. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

10

30. The Defendant Kara Beals ("Beals") is a resident of the State of Nebraska, and is licensed independent mental health practitioner in the State of Nebraska. Beals has provided health services to X.C.W. at various times since October, 2013. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

31. The Defendant Kersten Borer (hereinafter "Borer") is a resident of the State of Nebraska, and is a licensed mental health practitioner who provides mental health services in Omaha, Nebraska. Borer has provided health care services to X.C.W. since January, 2017. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

32. The Defendant Carla Heathershaw Risko ("Risko") is a resident of the State of Nebraska, and at all relevant times has been a duly licensed attorney, employed by the State of Nebraska, and has represented NDHHS in the Juvenile Court proceeding and other matters related to the minor children X.C.W. and Y.C.W. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

33. The Defendants Amy Schuchman ("Schuchman") and Michael Ciminois are resident of the State of Nebraska, and at all relevant times has been a duly licensed attorney employed as a deputy county attorney by Douglas County, Nebraska, and has represented the State in the Juvenile Court proceeding related to the minor children X.C.W. and Y.C.W. This

11

Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

34. John Does 1-30 to be named currently as fictitiously named defendants, who in their individual and/or official capacities are liable for their acts and omissions.

35. All of the above-referenced Defendants have acted and continue to act under the Color of State Law at all times relevant to the Complaint herein.

36. Plaintiffs sue all defendants, both in their official and individual capacities.

## JURISDICTION AND VENUE

37. The jurisdiction of this Court is invoked by Plaintiff pursuant to 28 U.S.C. §§ 1331, 1333, 1343 and 1367 which confer original jurisdiction upon this Court on the grounds that the instant action arises under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, as amended, 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988, and 28 U.S.C. § 2254.

38. Venue in the District of Nebraska is properly laid pursuant to 28 U.S.C. § 1391, insofar as the following alleged unlawful conduct complained of in this Complaint and Petition, which forms the factual and legal basis of the claims of the Plaintiff, arose or occurred within the geographical limits of this District.

## EXHAUSTION

39. Plaintiffs have exhausted all available administrative remedies regarding the matters described in this Complaint.

## FACTUAL BACKGROUND

40. Bo Wang, M.D. (hereinafter "Dr. Wang") and Wang Anderson are the natural and biological parents, and the psychological parents, of X.C.W. and her sister Y.C.W. Dr. Wang and Wang Anderson are, and at all relevant times have been, husband and wife. Both Dr. Wang and Wang Anderson were born and raised in China, and immigrated to the United States when they were young adults, more than 28 years ago, and have been naturalized U.S. Citizens for more than 19 years.

41. From shortly after her birth until October 9, 2013, X.C.W. was continuously in the care and custody of Dr. Wang and Wang Anderson, most recently in Omaha, Nebraska. While in the care and custody of her parents, X.C.W. was in excellent physical, emotional and mental health. As of October 9, 2013, X.C.W. was attending Millard West High School and was an exceptional student.

42. On or about October 7, 2013, Wang Anderson became concerned for Y.C.W.'s health, safety, and welfare when she learned of certain communications on a cellular phone between Y.C.W., another student, and a male teacher at the school where Y.C.W. attended. She was so concerned that she contacted the Nebraska State Patrol to report her concerns.

**Removal of Children**

43. On or about October 8, 2013, Y.C.W. was removed from Anderson's custody by Douglas County Sheriff's deputy Chad Miller, without a warrant or court order, never contacted Dr. Bo Wang, based on an interview with Y.C.W. at Millard West, and placed in the temporary custody of NDHHS. Y.C.W. was then placed in foster care with Derr, who was a non-relative licensed foster care provider.

44. On or about October 8, 2013, without a warrant, Deputy Miller went to Wang Anderson's home following his interview with Y.C.W. Wang Anderson and X.C.W. were

13

present at the home when Deputy Miller arrived. Wang Anderson spoke with Deputy Miller at the door of her home, but declined to allow him inside the home. Shortly after Deputy Miller's arrival, Douglas County Sheriff's Lieutenant Mark Gentile and Sergeant Pankonin arrived at Wang Anderson's home in order to make contact with X.C.W. and observe the living conditions inside of Wang Anderson's home. The law enforcement officers were able to speak with X.C.W. and observe the living conditions of the home. Following these personal interactions and observations, these law enforcement officers allowed X.C.W. to continue to remain in Wang Anderson's home.

45. On October 8, 2013, NDHHS Child and Family Services Specialist Jennifer White and NDHHS worker Archie Scott went to Wang Anderson's residence. White and Scott searched her residence at that time and then interviewed X.C.W. privately in the garage of Anderson's home. After the home search and interview of X.C.W., White and Scott determined it was safe to allow X.C.W. to remain in Wang Andeson's home and allowed her to remain there.

46. On the morning of October 9, 2013, White returned to Wang Anderson's home to go through a list of questions with Wang Anderson. Wang Anderson cooperated with White.

**First Foster Placement – Sonia Derr**

47. On or about October 9, 2013, after she had gone to school, X.C.W. was removed from Wang Anderson's custody by Douglas County Sheriff's deputy Brenda Wheeler, without a warrant or court order, without contacting Dr. Wang, and placed in the temporary custody of NDHHS. The same day, X.C.W. was placed in foster care with Derr. Reasonable efforts to allow X.C.W. to remain in the parental home were not made and should have been.

14

48. At all relevant times, X.C.W. had a clearly established Constitutional right to, and all Defendants had an obligation to provide her with adequate medical care, protection and supervision. See *Norfleet v. Arkansas Dept. of Human Svcs.,* 989 F.2d 289, 293 (8th Cir. 1993).

49. The constitutional substantive due process right to family integrity, including under the Fourteenth Amendment, protects: a) the child's right to be raised and nurtured by her biological parent; b) the right of both parent and child to each other's companionship; and, c) the parent's right to the companionship, care, custody, and management of his or her child. Both parents and their children have cognizable substantive due process rights to the parent-child relationship.

50. The fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) The Supreme Court has also noted that it is "cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for the obligations the state can neither supply nor hinder." *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944). Parents have a fundamental liberty interest in directing the education of their children. *Troxel v. Granville,* 530 U.S. 57,  120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.E. 1042 (1923). The Supreme Court has historically recognized that freedom of personal choice in matters of family life is a fundamental interest protected by

15

the Fourteenth Amendment. *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978). The integrity of the

family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the

Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment. *Stanley v.*

*Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)

51. A prompt detention hearing is required in order to protect a parent against the risk of

an erroneous deprivation of his or her parental interest. Continued detention pending

adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by

a preponderance of the evidence at an adversarial hearing that such detention is necessary for the

welfare of the juvenile. That evidence includes proof that reasonable efforts were made to

preserve and reunify the family when required under Neb. Rev. Stat. §43-283.01 (Reissue 1998).

This hearing is a parent's opportunity to be heard on the need for the removal and the satisfaction

of the State's obligations under § 43-283.01, and it is not optional when a child is detained for

any significant period of time. *In re Interest of Mainor T.,* 267 Neb. 232, 674 N.W.2d 442, 456-

457 (Neb. 2004). A delay of 18 days between removal and hearing has been held to be a denial

of a parent's right to due process. *In re Interest of Mainor T.,* 674 N.W.2d at 457. A delay of 14

days between entry of ex parte order and a detention hearing, even where a parent was allowed to

visit children in the interim, was found to "poise the procedures employed...on the brink of

unreasonableness." *In re Interest of R.G.,* 238 Neb. 405, 423, 470 N.W.2d 780 (1991).

52. At all relevant times, it was the policy of NDHHS and Nebraska Families

Collaborative that:

It is vital to maintain a child's connection to his/her family while the child is in

out-of-home care. Ensuring regular and quality parenting time maintains and

supports the parent-child relationship. The importance of continuing the parent-

16

child attachment and preserving the child's sense of belonging as a part of their

family, community, and culture is necessary for the child and family's well-being.

53. At all relevant times, it was the policy of NDHHS and NFC that:

For any ward in out-of-home placement, reunification will be the first

permanency objective considered... Alternatives to reunification will be

considered only when the family has been given reasonable opportunities to

reunify and those efforts haven't been successful.

54. At all relevant times, it was the policy of NDHHS and NFC that:

Contact between the child and parent(s) is important for: maintenance of

attachments and "primary family" role; validation for the parent(s) and child that

both are continuing to work toward return home of the child; assurance to the

child that he/she has not been abandoned or kidnapped; an opportunity for the

parent(s) to observe and practice positive parenting skills.

55. At all relevant times, it was the policy of NDHHS and NFC that:

When a child is in out-of-home placement and the case plan's permanency

objective is reunification, a written visitation plan will be developed to maintain

opportunities for regular contact between a child and her family. Frequent and

regular contact between parent(s) and child(ren) is critical to reunification.

56. At all relevant times, the following "Visitation Plan Guidelines" were the policy of

NDHHS and NFC:

   a) The worker will develop a written visitation plan identifying all parties'
      important role in establishing guidelines for visitation, and in assuring that
      visitation is successful for all family members and that all parties (parents,

child, foster care providers, person supervising if not the foster care provider) understand their roles and responsibilities.

b) The visitation plan will address, but is not limited to such issues as: dates, times and location of visits; how arrangements will be made; who will be present; arrangements for monitoring or supervision, if any; plan for handling emergency situations; and, procedures for handling problems with visitation.

57. At all relevant times, NDHHS regulations (390 NAC 390 7.001.02; NDHHS Case Management for Child Abuse, Neglect and Dependency Guidebook) and policy (Protection and Safety Procedure #28-2016) required NDHHS, its employees, and designated agents to do the following regarding visitation between the parent and minor child in out-of-home placement situations:

a) Develop an individualized parenting time plan with the parent(s) within 48 hours of the child's removal from the home.

b) "Parenting time guidelines" provide for a minimum of two visits per week for children ages eight to nineteen.

c) The Parenting Time Plan will be documented in N-FOCUS-Visitation Plan.

d) Supervisory approval of any parenting time less than the "parenting time guidelines", will be documented by the supervisor (or designee) in N-FOCUS-Visitation Plan – Other Issues.

e) Determine the supervision level of parenting time and make efforts to safely decrease the level of supervision based on assessment of the child's safety and the child's needs, utilizing the information from the safety plan or parenting time sections of the SDM Reunification Assessment to evaluate supervision of parenting time.

18

58. From the date of removal of the children through the date of the Juvenile Court's adjudication as described below, the State, NDHHS, NFC, Smith and Winans failed to create a plan for visitation between Wang Anderson and the children or between Dr. Wang and the children, as required by the aforementioned regulations and policies. These Defendants did not involve Anderson, Dr. Wang, or either of the children in formulating a visitation plan during that time period. On information and belief, these Defendants also failed and refused to encourage X.C.W. or Y.C.W. to engage in contact or visitation with Wang Anderson or Dr. Wang.

59. Although Y.C.W. and X.C.W. were both in ongoing therapy during that time period, the State, NDHHS, NFC, Smith and Winans failed to require or request that resuming contact with their parents be a goal of therapy.

60. All Defendants failed throughout the Juvenile Court proceeding to make any efforts to encourage or strengthen the parent-child relationship. See *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

61. On October 9, 2013, X.C.W. reported to NDHHS Family Engagement Specialist Nina Sheller that she: "feels safe with her mother and hopes to return to her home".

62. On October 10, 2013, Deputy Douglas County Attorney Michael Cimino filed a Petition in the Separate Juvenile Court of Douglas County, Nebraska, styled as *In the Interest of Y.C.W. and X.C.W.,* JV13-1903, (hereinafter "JV13-1903"), alleging that Y.C.W. and X.C.W. came within the meaning of Nebraska Revised Statutes, 1943, Section 43-247(3a).

63. As to Wang Anderson, the Petition specifically alleged:

> A. Said children have been subjected to inappropriate and dangerous discipline by their mother, Catherine Anderson;

19

B.  Catherine Anderson has failed to provide said children safe, stable and/or appropriate housing;

C.  Catherine Anderson has failed to provide proper parental care, support and/or supervision for said children;

D.  Catherine Anderson was observed to be acting in a manner consistent with untreated mental health needs;

E.  Due to the above allegations, said children are at risk for harm.

64.  As to Dr. Wang, the Petition specifically alleged:

A.  Bo Wang has failed to protect said children from inappropriate and dangerous discipline by their mother, Catherine Anderson;

B.  Bo Wang has failed to provide said children safe, stable and/or appropriate housing;

C.  Bo Wang has failed to provide proper parental care, support and/or supervision for said children;

D.  Due to the above allegations, said children are at risk for harm.

65.  The same day, Cimino filed a Motion for Temporary Custody dated October 10, 2013, along with an Affidavit for Removal of Juvenile(s) from Parental Custodial Home by Deputy Miller dated October 8, 2013; and an Affidavit for Removal of Minor Child from Parental/Custodial Home by Deputy Wheeler dated October 10, 2013.  On October 10, 2013, without notice to Anderson or Dr. Wang, Douglas County Separate Juvenile Court Judge Elizabeth Crnkovich rendered an ex parte Order for Immediate Custody which continued custody of Y.C.W. and X.C.W. with NDHHS for placement in foster care or other appropriate placement.

20

66. In her October 10, 2013 Order for Immediate Custody, Judge Crnkovich found that "reasonable efforts were made to prevent removal", which was not true, because there were not any evidence submitted to the court. No efforts were made to prevent removal, and there was no evidence that efforts were made to prevent removal of X.C.W. or Y.C.W. Judge Crnkovich's October 10, 2013 Order violated or authorized the continued violation of 42 U.S.C. § 671(a)(15). She denied the due process rights of Dr. Wang and Wang Anderson under the Vth and XIVth Amendment to the United States Constitution.

67. The State, NDHHS and NFC failed to develop a written individualized parenting time or visitation plan with either parent which complied with the aforementioned regulations and policies, or which ensured ongoing meaningful contact and communication between X.C.W. and her parents.

68. The educational rights of Wang Anderson and Dr. Wang with respect to X.C.W. have never been suspended or terminated.

69. The first hearing in JV13-1903 in the Separate Juvenile Court of Douglas County, Nebraska was not held until October 18, 2013, eight days after entry of the ex parte order for temporary custody. The hearing was a "First Appearance and Protective Custody" hearing. Both Anderson and Dr. Wang were present for the hearing. Y.C.W. and X.C.W. were not present for the hearing.

70. To sustain the continued temporary custody of a child, the State must prove the requirements of Neb. Rev. Stat. §43-254 by a preponderance of the evidence. *In re Interest of Borius H. et al.,* 251 Neb. 397, 558 N.W. 2d 31 (1997). These requirements include showing that: a) continuation of the juvenile in his or her home would be contrary to the health, safety, or

21

welfare of the juvenile; and, b) that reasonable efforts were made to preserve and reunify the family, if required under Neb. Rev. Stat. §43-283.01.

71. At the October 18, 2013 hearing, the State did not present any evidence to prove the requirements of Neb. Rev. Stat. §43-254, and Judge Crnkovich did not make a written determination that: a) continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of the children; or b) that reasonable efforts were made to preserve and reunify the family; or c) that any exception to the requirement of reasonable efforts was applicable. Even though Wang Anderson and Dr. Wang resisted temporary detention and requested a hearing on the issue of detention on October 18, 2013, the hearing was continued for another twenty days until November 7, 2013. Nearly one month passed after the entry of the ex parte temporary custody order before Anderson or Dr. Wang were afforded a detention hearing.

72. The State, NDHHS and NFC all failed to present a plan for visitation between X.C.W. and Anderson and Dr. Wang, or between Y.C.W. and Wang Anderson and Dr. Wang, to the Juvenile Court at the October 18, 2013 hearing. As a result, the Juvenile Court did not order a visitation plan at that hearing. The Juvenile Court said the following to Wang Anderson and Dr. Wang regarding visitation:

THE COURT: All right. Now, both of you have – till we get back, you have a right to visit your children. And it may be supervised, but that's just for everyone's protection, you know, so – however, I will tell you this. I'm told the girls are feeling like they don't want to visit. In these early stages and when you have teenagers, I don't force them. That just creates more anger and everything else. But I won't let that go on too long because I want to right now respect their wishes and we get working, figuring out what's going on. But I won't let – you

22

know, I don't think it's healthy for the kids to be – to keep that wall up. And so,
you know, if a little time goes by and they're still refusing, then we'll bring them
to court, then we'll talk about what we can do, because I don't want to over-
empower teenagers either. That's not healthy. So I'm just letting you know that
I'm providing an opportunity to visit, but in the next week or so I won't force
them. Certainly encourage. And we can revisit that when we come back and see,
see how they're doing. They need their mom and dad; okay? All right.

73.  On information and belief, during the time period from October 9, 2013 through
October 31, 2013, X.C.W.'s mental and physical condition were not properly assessed,
documented, or reported by NFC, NDHHS, Smith, Winans, Treinen, Gurock, Derr, or Christian
Heritage.

74.  On information and belief, during that same time period, X.C.W. was not adequately
monitored or supervised. On information and belief, between October 9, 2013 and October 31,
2013, X.C.W. and Y.C.W. began to show signs of mental, emotional, and physical distress or
illness. Derr failed to timely report those signs to any health care provider, to Christian Heritage,
NDHHS, NFC, Smith, Winans, Anderson, or Dr. Wang.

75.  On or about October 23, 2013, Derr, Trienen, NDHHS, NFC, Smith, Winans, and
Christian Heritage knew or should have known that X.C.W. had obtained those medications or
pills, and that X.C.W.'s possession of those medications or pills was dangerous to her.

76.  Derr, Trienen, NDHHS, NFC, Smith, Winans, and Christian Heritage all failed to
timely report this information to any medical provider, to X.C.W.'s parents, or to the Court

77.  On information and belief, during that time period, X.C.W.'s mental and emotional
condition deteriorated as a direct and proximate result of: a) being removed from Anderson's

23

care; and, b) failure of Derr, Christian Heritage, Smith, Winans, Trienen, NFC, and NDHHS to properly monitor and supervise X.C.W. and to timely report and respond to the signs X.C.W. was showing of mental, emotional, and physical distress and illness.

78.   On information and belief, was referred to the Eating Disorders Program of Children's Hospital and Medical Center ("Children's Eating Disorders Program") on October 31, 2013.

79.   On information and belief, Defendants Beals and Dr. Harrington did an intake and mental status assessment of X.C.W. on October 31, 2013. On information and belief, Beals and Dr. Harrington failed to obtain and consider necessary information regarding X.C.W.'s developmental, family, and medical history before making diagnoses and recommendations for X.C.W. Beals and Dr. Harrington failed to obtain and consider X.C.W.'s health records and failed to consult with either her mother or her father regarding her health history. These failures constituted a departure from the standard of care by Beals and Dr. Harrington.

80.   On information and belief, based on their October 31, 2013 assessment, Beals and Dr. Harrington formed diagnostic impressions and recommended that X.C.W. attend the Children's Eating Disorders Program.

81.   On information and belief, prior to recommending such a high level of treatment, Beals and Dr. Harrington did not first attempt to treat X.C.W. with a less restrictive level of treatment.

**Admission to Children's Hospital Partial Program**

82.   On information and belief, on or about October 31, 2013, X.C.W. was admitted to the partial hospitalization program part of the Children's Eating Disorders Program in Omaha, Nebraska by Dr. Harrington and Kara Beals, with the assent of NFC, Derr, and Smith. She was

admitted to the Children's Eating disorders Program until about January 23, 2014. At all times when X.C.W. was admitted to this program, she was under the health care of Dr. Harrington and Beals. While she was admitted to this program, X.C.W. continued to reside with Derr and Y.C.W., but was physically present at the Children's Eating Disorders Program during most daytime hours.

83. On information and belief, the admission of X.C.W. to the partial hospitalization part of the Children's Eating Disorders Program isolated X.C.W. from her parents and from other normal social interactions, to the detriment of her health and well-being. On information and belief, her admission to this program also caused X.C.W. to be excessively preoccupied with her nutrition, weight, appearance, and health, and distracted her from the normal age-appropriate occupations and responsibilities. As a proximate result of her admission to the partial hospitalization part of the Children's Eating Disorders Program, X.C.W.'s condition worsened.

84. At all relevant times, the Children's Eating Disorders Program treatment components included medical management, individual therapy, family therapy, group therapy, nutrition, and recreation therapy.

85. As of the time of X.C.W.'s admission to the partial hospitalization program, she was not prescribed or taking any prescription medications.

86. At all relevant times, family therapy was an "integral" part of an eating disorder patient's recovery, and was mandated by insurance companies if the patient was a minor. The standard of care for treatment of eating disorders required family therapy.

87. Family therapy was not offered or provided to X.C.W. and her parents from October 31, 2013 through January 23, 2014.

25

88. At all relevant times, the continuum of care for the Children's Eating Disorders Program included outpatient services, partial hospitalization and evening outpatient.

89. On information and belief, Dr. Harrington and Beals could have provided X.C.W. with the appropriate standard of care for the symptoms of October 31, 2013 through outpatient services or evening outpatient care, rather than immediately recommending the more restrictive and isolating partial hospitalization.

90. On information and belief, Dr. Harrington and Beals admitted X.C.W. to the partial hospitalization part of the Children's Eating Disorders Program without first obtaining proper informed voluntary consent from X.C.W. or NDHHS.

91. On information and belief, neither Derr, nor Smith, nor Winans, nor NFC had authority to consent to health care for X.C.W. at any time.

92. Neither Wang Anderson nor Dr. Wang were consulted with, informed about or consented to the admission of X.C.W. to the Children's Eating Disorders Program.

93. Neither Wang Anderson nor Dr. Wang were consulted with, were informed about or consented to X.C.W.'s school attendance being suspended, altered, or discontinued on or after October 31, 2013.

94. On information and belief, X.C.W. attended Millard West High School until she was admitted to the Children's Eating Disorders Program.

95. As a direct and proximate result of her admission to the Children's Eating Disorders Program, X.C.W. did not attend school from October 31, 2013 through January 23, 2014. On information and belief, NDHHS, NFC, Winans, Smith and Derr failed to ensure that X.C.W. was attending school during that time period, and failed to retrieve and deliver school work for X.C.W. on a timely and regular basis. In fact, the admission of X.C.W. to the Children's Eating

26

Disorders Program proximately caused her to withdraw from all of her classes at Millard West
High School during the 2013 fall semester.

96.  Wang Anderson offered on numerous occasions to retrieve and deliver X.C.W.'s
school assignments to her and deliver them to the school upon completion of work, but those
offers were all declined by NDHHS, NFC, Smith and Winans.

97.  On information and belief, NDHHS, NFC, Smith and Winans all failed to ensure that
X.C.W. attended school during the 2014 spring semester.  In fact, X.C.W. did not attend school
during the 2014 spring semester and did not compete classes for that semester.

98.  As a direct and proximate result of her admission to the Children's Eating Disorders
Program, X.C.W. was denied her right to education and her liberty was restrained.

99.  As a direct and proximate result of her admission to the Children's Eating Disorders
Program, Dr. Harrington, Beals, NFC, Smith, NDHHS, and Derr violated the Constitutional right
of Anderson and Dr. Wang to direct the education of X.C.W.

100.  On November 7, 2013, 28 days after removal, a protective custody (detention)
hearing was held in the Separate Juvenile Court in JV13-1903. Wang Anderson and Dr. Wang
were present, but neither Y.C.W. nor X.C.W. was present.  Following the hearing, the Juvenile
Court ordered that Y.C.W. and X.C.W. remain in the temporary custody of NDHHS.

101.  At the November 7, 2013 hearing, neither the State nor NDHHS presented any
evidence regarding the issue of parental visitation with the minor children.  At that hearing, and
without prior notice to Anderson or Dr. Wang, NDHHS attorney Carla Heathershaw Risko asked
that "all contact with the parents be therapeutic in nature."  Although she did not present any
evidence in support of this recommendation, Risko stated that "The visitations have been
supervised and have had to end early due to continued inappropriate behavior by Ms. Anderson

27

at those visits, including pressuring the girls and making them feel guilty about the fact that this case is involved with the Juvenile Court."

102. On information and belief, Risko's statement was false, inaccurate, and misled the Court.

103. On or about November 7, 2013, based upon Risko's representation, the Juvenile Court ordered that Anderson "shall have reasonable rights of therapeutic visitation as arranged by the Nebraska Department of Health and Human Services."

104. On information and belief, there was no proper basis for the November 7, 2013 NDHHS recommendation stated by Risko.

105. The Court's order for "therapeutic" visitation was an improper delegation of a matter for constitutionally authorized judicial determination, in at least two respects. First, arrangement of the "therapeutic" visitation was left to the discretion of NDHHS. The Nebraska Juvenile Code does not authorize NDHHS to determine or place restrictions on parental visitation rights. Parental visitation rights, as a subject within the Nebraska Juvenile Code, are matters for judicial determination. *In re Interest of C.A.,* 235 Neb. 893, 900, 457 N.W.2d 822 (1990). Second, the commencement, occurrence, or non-occurrence of visitation was subject to and conditioned upon the availability and approval of a therapist, presumably to be chosen by NDHHS. Not only was this an improper delegation of a matter for judicial determination to an undetermined and unknown therapist, it also implicitly required Anderson to submit to mental health services prior to adjudication, which the Court did not have jurisdiction to do.

106. NDHHS, NFC, Winans, Smith and Risko knew that requesting such a condition was contrary to NDHHS policy as there was no such thing as "therapeutic" visitation provided in its policies. (See Case Management for Child Abuse, Neglect and Dependency Cases

28

Guidebook, page 30) These defendants also knew or should have known that visitation between the children and their parents would not occur or would be delayed as a direct result of the condition that the visits be therapeutic in nature.

107. Requesting and imposing such a limitation on Wang Anderson's visitation rights was a barrier to reunification created by NDHHS, Risko, NFC, Smith and Winans. This limitation led to delayed and infrequent visitation and contact between the children and Anderson, which was foreseeable to NDHHS, Risko, NFC, Smith and Winans at the time the recommendation for "therapeutic visitation" was made to the Juvenile Court.

108. On information and belief, NDHHS, NFC, Risko, Winans, and Smith did not make a referral for, or otherwise coordinate or arrange for therapeutic visitation between X.C.W. and Wang Anderson or between X.C.W. and Dr. Wang in a timely fashion.

109. From November 7, 2013 through January 23, 2014, Dr. Wang was not allowed to see or visit with X.C.W. on Thanksgiving of 2013, Christmas of 2013, New Year's Day of 2014, or the Chinese New Year of 2014.

110. Treinen provided therapy services for Y.C.W. from October, 2013 through May, 2014. On information and belief, during that time period, Treinen did not encourage Y.C.W. to engage or participate in contact or communication with Wang Anderson or Dr. Wang, which was contrary to reunification. On information and belief, during that time period, Treinen repeatedly informed Y.C.W. that she had a "right to refuse" visitation with her parents, and Treinen supported her right to refuse, rather than encouraging Y.C.W. to engage or participate in contact or visitation with Wang Anderson and Dr. Wang.

111. In its Protective Custody Order of November 13, 2013, the Juvenile Court also ordered that "the Director of the Nebraska Department of Health and Human Services or his duly

29

appointed representative shall furnish a report to this Court as to the care, maintenance, moral and physical training of said children every 60 days." Neither the NDHHS, NFC, Risko, Winans, Smith, Paul, Richardson, Petzel, nor Richey, nor any other employee or agent of NDHHS complied with this order of the Juvenile Court. As a result, the condition of the children deteriorated to the detriment of the all plaintiffs.

112. On December 10, 2013, a Case Settlement Conference was held in JV13-1903 before the Douglas County Separate Juvenile Court. At that time, the adjudication hearing was scheduled to begin on March 12, 2014, approximately five (5) months after the minor children were removed from the care and custody of Anderson.

113. Neb. Rev. Stat. § 43-278 generally requires that all cases filed under Neb. Rev. Stat. § 43-247(3) must have an adjudication hearing not more than 90 days after the petition is filed. The court may only continue the case beyond the 90-day period upon a showing of good cause. No showing of good cause for continuance was made by the State of Nebraska or any other party to JV13-1903, and the Juvenile Court did not make a finding of good cause when it set the adjudication hearing for March 12, 2014.

114. On about December 11, 2013, Dr. Harrington recommended and prescribed the drug Zoloft for X.C.W. X.C.W. began taking Zoloft on that date. Neither Dr. Harrington, Beals, nor any other health care provider informed Dr. Wang or Wang Anderson regarding the Zoloft recommendation before it was prescribed for and administered to X.C.W. Neither Dr. Wang nor Wang Anderson gave consent to X.C.W. taking the drug Zoloft.

115. On December 20, 2013, Martin Harrington, M.D., recommended that X.C.W. be transferred to an inpatient eating disorder program to allow for more intensive monitoring and treatment to address her eating disorder and anxiety symptoms. Dr. Harrington opined that it

30

would be essential for X.C.W.'s success "that the program have expertise in addressing her anxiety via appropriate therapy techniques and family issues through family therapy as well as addressing and monitoring her eating disordered behaviors aggressively." On December 27, 2013, Dr. Harrington specifically recommended placement at one of the following facilities: Brandywine Hospital in Coatsville, Pennsylvania; Roger's Memorial Hospital in Oconomowok, Wisconsin; and Children's Medical Center in Plano, Texas.

116. As of December 31, 2013, neither NDHHS, NFC, Winans, Smith nor any of their respective employees, agents, or designees had applied for X.C.W. to be placed at any of the three recommended facilities (Brandywine, Pennsylvania; Roger's Memorial, Wisconsin; or, Children's Medical Center, Texas), or made any other efforts to provide X.C.W. with proper health care, notwithstanding the life-threatening condition X.C.W. was in. Despite Anderson's repeated pleas and filing of a motion for emergency transfer with the Juvenile Court, 23 more days passed while X.C.W.'s health continued to decline until NDHHS, NFC, Winans, and Smith finally transferred her to Laureate Hospital on January 23, 2014.

117. On December 31, 2013, based on the written recommendations of Dr. Harrington, Wang Anderson filed a Motion in the Juvenile Court requesting an order directing NDHHS and NFC to seek immediate placement of X.C.W. for inpatient treatment at Children's Medical Center in Plano, Texas or other facility approved by Dr. Harrington.

118. During the time period between October 8, 2013 and the present, necessary and appropriate health care and other necessary services have not been coordinated, arranged, or provided for X.C.W. or Anderson or Dr. Wang in a timely manner by NFC, NDHHS, Smith, Winans, Richardson, Paul, Petzel, Richey, or Dr. Harrington. Anderson repeatedly had to contact providers directly to request necessary services for X.C.W. in order to get those services

31

arranged. On information and belief, but for Anderson's persistent requests and contacts, many of those services would not have been arranged at all.

119. The Juvenile Court heard Anderson's Motion regarding inpatient treatment on January 9, 2014. NDHHS, NFC, Smith and Winans failed to even make application for placement of X.C.W. at any of the three facilities until January 9, 2014, which was two weeks after Dr. Harrington's recommendation was made. Although NDHHS, NFC, Smith, Winans and their respective employees, agents and designees were aware of the three facilities recommended by Dr. Harrington, application was made to only one facility, the facility in Wisconsin on that date. No application was made to Children's Medical Center in Plano, Texas, despite the fact that the Plano facility was in close proximity to Dr. Wang's usual residence and more conducive to including him in family therapy.

120. Despite the fact that Judge Crnkovich knew from Anderson's motion and evidence at the January 9, 2014 hearing that X.C.W.'s condition was so poor that she needed to be transferred to an inpatient eating disorder facility immediately, she denied Anderson's December 31, 2013 Motion.

121. In the Juvenile Court's order of January 10, 2014, Judge Crnkovich sought input from NDHHS and the "mental health professionals" as to whether the current level of supervision of Anderson's visits was appropriate, and whether other visitation arrangements would better serve the children's needs.

122. On January 15, 2014, therapist Beals confirmed that X.C.W. had stated to her that "she enjoys the visits with her mother". Beals recommended "one (1) therapeutic visit a week (supervised by a therapist, as well as Teresa Nutzman, Catherine Andersons, GAL) as well as one (1) supervised visit a week to be supervised by a visitation specialist provided by the state."

32

123. On or about January 15, 2014, Beals stated in an email to Risko: "I also believe it is in the pts best interest that family therapy occur. Family Therapy is an integral part of the pts recovery, and is mandated by most insurance companies if the pt. is a minor. If this cannot be done due to the case being in the pre-adjudication phase, I believe a meeting between a therapist, the pt., the pts mother and the pts mother GAL, is beneficial to discuss the pts progress in the program, to help aide in improving the communication between the pt. and her mother, as well as to discuss any concerns regarding the eating disorder treatment that the pt. is receiving."

124. The ongoing failure and refusal by NDHHS, NFC, Risko, Smith, and Winans to provide family therapy to X.C.W. and her parents excluded Anderson and Dr. Wang from participating in X.C.W.'s health care, was a barrier to improving communication between X.C.W. and her parents, and prevented Anderson and Dr. Wang from being able to communicate their concerns regarding X.C.W.'s eating disorder treatment with the appropriate providers.

125. As of October 13, 2013 and thereafter, NDHHS, NFC, Winans, Smith and their respective employees, agents, and designees knew that frequent visitation between X.C.W. and each of her parents was essential to X.C.W.'s reunification with her parents, and that a written individualized parenting time or visitation plan was required. As of January 15, 2014, NDHHS, NFC, Winans, Smith and their respective employees, agents, and designees knew that family therapy was an "integral" part of X.C.W.'s recovery from her eating disorder.

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983 – FOURTH AMENDMENT AND FOURTEENTH AMENDMENTS**

**Procedural Due Process, Unlawful Seizure, and Familial Association**

**Against Defendants Wheeler, Miller, Gentile, Sheller, White, Heys, Hancock, and Tiemann**

33

126.  Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 125 above, as if fully set forth here.

127.  Under the circumstances of this case outlined above, X.C.W. had the right to be free from unreasonable seizure under the Fourth Amendment of the United States Constitution, which right was "clearly established" as of the time of the seizure, such that a reasonable law enforcement officer or social worker in Defendants' situation would know that it is wrong to interfere in a child's right to remain with her parent in the absence of exigent circumstances, and that such right may not be impinged upon without first obtaining a warrant or other court order to do so.

128.  Under the circumstances of this case outlined above, X.C.W. and Dr. Wang had the right to be free from the severance of their familial association without due process of law under the Fourth Amendment of the United States Constitution, which right was "clearly established" as of the time of the seizure, such that a reasonable law enforcement officer, school official or social worker in Defendants' situation would know that it is wrong to interfere in a parent's right to the care and custody of his child in the absence of exigent circumstances, and that such right may not be impinged upon without first obtaining a warrant or other court order to do so and other due process.

129.  The actions of Deputy Wheeler, Deputy Miller, Lieutenant Gentile, Sheller, White, Heys, Hancock, and Tiemann caused or contributed to the unlawful seizure, detention, and removal of X.C.W. from Dr. Wang and Wang Anderson's care and custody without proper justification or authority, without a warrant, in the absence of exigent circumstances, an emergency or probable cause, without consent, court order, or any other legal basis for the removal of X.C.W. from the care and custody of Dr. Wang and Wang Anderson.

34

130. Defendants' actions were taken with deliberate indifference to Plaintiffs' rights.

131. As a direct and proximate result of these Defendants' actions, Plaintiffs have suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an extent and in an amount subject to proof at trial.

132. Defendants Gentile, Wheeler, Miller, Sheller, White, Heys, Hancock and Tiemann are vicariously responsible for the conduct of each other and Does 1 through 15, inclusive, under applicable statutory and case law.

133. On information and belief, Gentile, Wheeler, Miller, Sheller, White, Heys, Hancock, and Tiemann and Does 1 through 30, inclusive, and each of them were motivated by evil motive or intent, or acted with reckless or callous indifference to Plaintiff's federally protected rights. Thus, Plaintiffs are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – MONELL-RELATED CLAIMS

**Against County of Douglas, Nebraska Families Collaborative, Christian Heritage, Children's Hospital and Medical Center, Millard Public Schools, and Does 1 through 30, Inclusive**

134. Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 125 above, as if fully set forth here.

135. On information and belief, Defendant County of Douglas, (including through its entities Douglas County Sheriff and Douglas County Attorney), and Defendants NFC, Christian Heritage, Children's Hospital and Medical Center, , Millard Public Schools, and Does 1 through

35

30, inclusive, established and/or followed policies, procedures, customs, usages and/or practices

(hereinafter referred to collectively as "policy" or "policies") which policies were the moving

force behind the violations of Plaintiffs' constitutional rights as alleged hereinabove, including

those arising under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United

States Constitution, by and through, but not limited to, the following policies, practices, customs,

usages and/or procedures:

a. the custom of detaining and/or removing children from their family and homes without

exigent circumstances (imminent danger of serious physical injury), court order and/or consent;

b. the custom of removing children from their family and their homes without first obtaining a

warrant or other court order when no exigency exists;

c. the custom of examining (medically) children without exigency, need, or proper court order,

and without the presence and/or consent of their parent or guardian;

d. the custom of removing and detaining children, and continuing to detain them for an

unreasonable period after any alleged basis for detention is negated;

e. the custom of using trickery, duress, fabrication and/or false testimony and/or evidence, and

in failing to disclose exculpatory evidence, in preparing and presenting reports and court

documents to the Court, causing an interference with Plaintiffs' rights, including those as to

familial relations;

e. the custom or policy of not conducting proper intake assessments, safety assessments, family

assessments and other assessments or evaluations as to the strengths and needs of children and

families who are the subjects of intervention;

36

f. the custom or policy of not arranging, coordinating, referring, or providing services, in a clear and timely fashion, which are appropriate and reasonably calculated to address the needs of those children and families;

g. by acting with deliberate indifference in implementing a policy of inadequate training, and/or by failing to train its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments, when performing actions related to child abuse, neglect or dependency type proceedings.

h. by acting with deliberate indifference in implementing a policy of inadequate supervision, and/or by failing to adequately supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments, when performing actions related to child abuse, neglect or dependency type proceedings.

i. the policy of making false or unfounded allegations in Juvenile Petitions, i.e. alleging that a parent was observed to be acting in a manner consistent with untreated mental health needs under Neb. Rev. Stat. § 43-247(3a), where there is no evidentiary basis to support the charge.

j. by acting with deliberate indifference in implementing a policy which allows for arranging or providing health care for a child without first obtaining proper informed consent.

k. the policy of improperly influencing, manipulating, or controlling the services and opinions of health care providers and other professionals, or attempting to do so, as those services relate to the assessment, evaluation, diagnosis, treatment, or other care provided by those providers or other professionals; and,

l. the policy of placing children in over-crowded foster homes.

37

(This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile proceedings. Plaintiffs reserve the right to amend this pleading as more information becomes available.)

136. County of Douglas, NFC, Christian Heritage, Children's Hospital and Medical Center, Millard Public Schools, and John Does 1 through 30, Inclusive, all breached their duties and obligations to Plaintiffs by, including but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs, usages, and practices; by failing to properly select, supervise, train, control, and review their agents and employees as to their compliance with Constitutional safeguards with deliberate indifference; and by knowingly, or with deliberate indifference, permitting one or more of the individual Defendants herein to engage in unlawful and unconstitutional conduct as herein alleged.

137. County of Douglas, NFC, Christian Heritage, Children's Hospital and Medical Center, Millard Public Schools, and John Does 1 through 30, Inclusive knew, or should have known, that by breaching the above-mentioned duties and obligations that it was foreseeable that said failure would, and did, cause Plaintiffs to be injured and damaged, and their constitutional rights to be impaired, by the wrongful policies and acts as alleged herein, and that such breaches occurred in contravention of public policy and Defendants' legal duties and obligations to Plaintiffs; and that such policies, practices, and customs and procedures were the moving force behind the constitutional violations alleged herein above.

138. These actions, and/or inactions, of County of Douglas, NFC, Christian Heritage, Children's Hospital and Medical Center, Millard Public Schools, , and John Does 1 through 30, Inclusive were the direct and proximate cause of Plaintiffs' injuries, as alleged herein; and as a

result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 – VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS TO FAMILY INTEGRITY AND THE PARENT-CHILD RELATIONSHIP UNDER THE FOURTEENTH AMENDMENT

**Against all Individual Defendants**

139. Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 380 above, as if fully set forth here.

140. Parents and their children have a recognized unique and legal interest in, and a constitutionally protected right to, companionship. The substantive due process right to family integrity protects not only the parent's right to the companionship, care, custody, and management of his or her child, but also protects the child's reciprocal right to be raised and nurtured by his or her biological parent. It is clear that both parents and their children have cognizable substantive due process rights to the parent-child relationship. Amanda C. ex rel. Richmond v. Case, 275 Neb. 757 (Neb. 2008).

141. From October 8, 2013 through the present, X.C.W., Wang Anderson, and Dr. Wang have all had a constitutionally protected substantive due process right to family integrity.

142. From October 8, 2013 through the present, each of the individual Defendants have violated the substantive due process right to family integrity of X.C.W., including her right to the companionship of her parents and her rights to be raised, guided and nurtured by her parents, in one or more of the following respects:

a. Removal from the family home even though X.C.W. said she felt safe with her mother;

b. Denial of, and failure to provide or arrange visitation;

c. Recommending the imposition of excessive and unwarranted restrictions and limitations on visitation;

d. Filing or recommending the filing of a petition to terminate parental rights without sufficient evidence;

e. Improperly requesting the suspension of contact between X.C.W. and her parents;

f. Failing and refusing to place X.C.W. with her Chinese relative, even though she requested it;

g. Making decisions with regard to the education of X.C.W. without notifying Wang Anderson or Dr. Wang, obtaining their consent or approval, or affording them an opportunity to be heard regarding the decisions, including decisions to remove X.C.W. from school, transfer her to a different school, discontinue or change classes, assess, identify, or evaluate X.C.W. and other decisions;

h. Repeatedly failing to ensure and maintain meaningful parental contact and to encourage X.C.W.'s engagement with her parents.

143. From October 8, 2013 through the present, each of the individual Defendants violated the substantive due process right to family integrity of Wang Anderson and Dr. Wang, including their right to the companionship, care, custody and management of their children, in one or more of the following respects:

a. Removal of their children from the family home even though X.C.W. said she felt safe with her mother;

b. Denial of visitation;

40

c. Recommending the imposition of excessive and unwarranted restrictions and limitations on visitation;

d. Filing a petition to terminate parental rights without sufficient evidence;

e. Improperly requesting the suspension of contact between X.C.W. and her parents;

f. Failing and refusing to place X.C.W. with her Chinese relative, even though X.C.W. and they requested it;

g. Failing to conduct a proper investigation;

h. Failing to perform proper assessments and/or evaluations;

i. Not developing, preparing, or maintain a proper written visitation plan;

j. Deliberately, or with deliberate indifference, failing to make efforts toward reunification and encouraging other Defendants to not make efforts toward reunification;

k. Withholding information regarding X.C.W. from Wang Anderson and Dr. Wang;

l. Making false, misleading, or inaccurate statements or representations to the Juvenile Court.

144. From October 28, 2013 through the present, Judge Crnkovich, acting outside of all judicial authority and jurisdiction, violated Dr. Wang's right to due process, and is not protected from liability for the same by judicial immunity, in the following respects:

a. Appointing a guardian ad litem for him without notice, evidence, or other due process;

b. Continuing the appointment of a guardian ad litem for Dr. Wang throughout the Juvenile Proceeding, without ever affording Dr. Wang an opportunity to be heard regarding his mental health, capacity, competency, the appropriateness of a guardian ad litem;

c. Not defining the role of the guardian ad litem for Dr. Wang from 2014 through November 3, 2015;

41

d.  Disregarding, ignoring, or unreasonably misconstruing Dr. Wang's affidavits, statements in

court, and pleadings filed by his counsel (which were all filed or made in an effort to protect her

children) as indicating that Dr. Wang had ongoing mental health problems;

e.  Criticizing and demeaning Dr. Wang in the presence of other parties to the Juvenile

Proceeding during hearings;

f.  Imposing unconstitutional restraints on Dr. Wang's ability to exercise his parental rights,

including , without limitation, the health care and education of her children, without notice, a

hearing, evidence, or other due process;

g.  Imposing unconstitutional restraints on Dr. Wang's ability avail himself of due process in the

Juvenile Proceeding in other respects without notice, a hearing, or other due process;

h.  Suspending Dr. Wang's contact with X.C.W. on at least two occasions without proper notice,

hearing, evidence, or other due process;

i.  Communicating to the parties to the Juvenile Proceeding, including NDHHS and its agents, at

the October, 2013 hearing that, in essence, she would not require the minor children to visit their

parents.

j.  Imposing restraints on Dr. Wang's First Amendment rights, including to free speech, in

barring him from communicating with school affecting his children, without notice, a hearing, or

other due process.

146.  On information and belief, Defendants NDHHS, NFC, Christian Heritage, Douglas

County, MPS, Children's, are liable for the aforementioned violations because they were

committed in furtherance of unconstitutional policies and customs of NFC, and because the

violations consist of actions taken by NFC representatives which inflicted injuries redressable by

section 1983.

147. On information and belief, Defendants State of Nebraska, NDHHS, NFC, Christian
Heritage, Douglas County, MPS, Children's committed all relevant actions in reliance on
governmental assistance or benefits.

148. On information and belief, Defendants State of Nebraska, NDHHS, NFC, Christian
Heritage, Douglas County, MPS, Children's were all performing traditional governmental
functions when they acted as described elsewhere in this Cause of Action.

149. As a direct and proximate result of these Defendants' actions, Plaintiffs have
suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an
extent and in an amount subject to proof at trial. On information and belief, said Defendants
acted with malice, and Plaintiffs are therefore entitled to punitive damages.

### FOURTH CAUSE OF ACTION

### 42 U.S.C. § 2000d – DISCRIMINATION

### Against all Defendants

150. Plaintiffs replead and incorporate by reference the allegations contained in
paragraphs through 125 above, as if fully set forth here.

151. X.C.W. and Dr. Wang were, on the ground of race, color, or national origin,
excluded from participating in, denied benefits of, or were subjected to discrimination under one
or more programs or activities receiving Federal financial assistance.

152. On information and belief, on the grounds that Dr. Wang and X.C.W. are Asian and
of Chinese origin:

a. NDHHS, NFC, Wheeler and Gentile did not conduct a fair investigation prior to or after
removal of X.C.W. or Y.C.W. from the Wang home, and failed to consider and recognize that

43

the characteristics of Wang Anderson and her residence observed by these Defendants were consistent with the traditions, customs, and mores of Chinese culture.

b. White, Winans, Smith, Paul, Richardson, Richey, and Petzel did not place X.C.W. on one or more occasions with her Chinese relatives Zhang and Dong, despite the requests of X.C.W. and Wang Anderson and the applicable regulations which required preference of relative placements over other placements. On information and belief, Smith or Richardson deliberately did not place X.C.W. with these relatives precisely because they were of her same race and national origin, including because of cultural norms, traditions, mores of the Chinese people. On or about June 5, 2014, Parke made a recommendation to Smith not place X.C.W. with a Chinese family because it would be "traumatic" for X.C.W., which recommendation was the basis for the decision by NDHHS, NFC, Smith and Winans to not place X.C.W. with a Chinese relative family, and instead place her in a foster home already overwhelmed with too many children.

c. Said Defendants failed to make or implement a plan for reunification or visitation as they would have for non-Asian or non-Chinese families.

153. As a direct and proximate result of these Defendants' actions, Plaintiff has suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an extent and in an amount subject to proof at trial. On information and belief, said Defendants acted with malice, and Plaintiff is therefore entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against each of the aforementioned defendants, jointly and severally, for general damages, pain and suffering, economic loss, physical, psychological, mental, and emotional damage, hedonic, punitive and other damages,

costs of suit, attorney fees, for injunctive relief as more specifically requested above, and for such other and further relief as the Court deems appropriate.

Dated: October 7, 2017.

FURTHER AFFIANT SAYETH NOT.

Dated this 7ᵗʰ of October, 2017.

BO WANG, Affiant

404 S FRYERS CREEK CIR, APT 1323

TEMPLE, TX 76504

Tel: (402) 218-7295

Email: pathfellow@yahoo.com

Subscribed and sworn to before me on October 7ᵗʰ, 2017, by BO WANG.

Notary Public

Bwang

Bo Wang

404 S. Fryers Creek Cir

Apt. # 1323

Temple, TX 76504

7017 0530 0001 0961 4790



U.S. POSTAGE
PAID
OMAHA, NE
68154
OCT 05 17
AMOUNT
**$8.55**
R2304M112469-34

To: U.S. District Court

— Nebraska

111 South 18th Plaza, Suite 1152

Omaha, NE 68102

**RECEIVED**

OCT 1 0 2017

CLERK
U.S. DISTRICT COURT

RETURN RECEIPT
REQUESTED

*FIRST CLASS*